WESTERN AUTO SUPPLY COMPANY v. JAMES OLIVER VICK, TRADING AND DOING BUSINESS AS A WESTERN AUTO ASSOCIATE STORE

No. 807SC58

(Filed 5 August 1980)

1. Usury § 1– findings unsupported by evidence
   In an action in which defendant store owner contended that transactions involving the assignment of chattel paper to plaintiff Western Auto fell within the purview of the usury laws, there was no evidence in the record to support the trial court's findings that (1) "Without regard to whether payment for merchandise purchased by [defendant] from [plaintiff] ... was made in cash or with chattel paper, the amounts for which [defendant] was given cash or chattel paper — equivalent credit upon his account(s) were no longer deemed by [plaintiff] or [defendant] to be owed by [defendant] to [plaintiff] for the merchandise purchases by [defendant] reflected in his account(s)," and (2) plaintiff and defendant "intended and viewed the transactions between them as the purchase and sale of merchandise and the

purchase and sale of chattel paper," since to the extent that defendant paid for his purchases from plaintiff with chattel paper, defendant continued to be obligated or indebted to plaintiff for the payments reflected in the chattel paper until defendant remitted cash to plaintiff equivalent to those installments.

2. **Usury § 1– purchase of Western Auto Store – payment of individual debtors' debts – usurious transactions**

Transactions pursuant to an agreement whereby defendant purchased the assets of a Western Auto Store which had previously been operated by plaintiff were usurious and could not be considered the sale of chattel paper at a discount where the evidence tended to show that defendant was responsible for collecting and forwarding amounts due from individual installment debtors to plaintiff; defendant was required to pay to plaintiff all installments when due, whether or not the installments were paid by the individual debtors; defendant was required to repurchase all chattel paper from plaintiff on accounts more than ninety days in arrears even though he had been making the payments as they became due to plaintiff; plaintiff obtained a security interest in the chattel paper collateralizing defendant's debt; for the period specified in each installment contract, plaintiff refrained from collecting from defendant sums due under the contract; as defendant paid off the deferred installment payments under the chattel paper, he was credited only with that portion of the installments attributed to principal, plus 30 or 35% of the finance charge; and plaintiff kept for itself 65 or 70% of the finance charge.

3. **Usury § 1.3– amount of interest – amount financed determined on transaction-by-transaction basis**

Where defendant contended that the transactions between the parties were usurious, there was no merit to plaintiff's contention that, since the total balance which defendant owed was considered to be in excess of $300,000, the parties were free to agree on any rate of interest under G.S. 24-1.1(5), as that statute was in effect at that time, since the only reasonable interpretation of that statute is that the principal amount financed must be determined on a transaction-by-transaction basis, at least where the transactions are not contemporaneous, and not on the basis of the aggregate amount owing between the parties.

4. **Usury § 1– corrupt intent – sufficiency of evidence**

Defendant showed the requisite corrupt intent on the part of plaintiff for the transactions in question to be held usurious, since the corrupt intent required to constitute usury is simply the intentional charging of more for money lent than the law allows, and plaintiff intended to exact the interest which it did by keeping 65 or 70% of the unearned finance charge on each of the contracts "assigned."

5. **Usury § 1– usurious transactions – no time-price sales**

Transactions between the parties which defendant claimed were usurious did not fall within the "time-price" exception to the usury statutes

Auto Supply v. Vick

since the transactions complained of did not involve the bona fide sale of chattel paper; defendant's obligation to plaintiff was not finally determined when contracts were assigned to plaintiff, but only when installments were paid under the contracts; the contracts themselves were merely regarded by the parties as security for the advancement of credit by plaintiff to defendant; and the transactions possessed none of the attributes commonly associated with time-price sales.

APPEAL by defendant and plaintiff from Browning, Judge. Order entered 10 July 1979 and judgment entered 29 June 1979 in Superior Court, NASH County. Heard in the Court of Appeals 4 June 1980.

Based upon the extensive stipulations of the parties and the evidence adduced at the trial below, the factual background of this case is as follows. Plaintiff Western Auto is engaged in the business of selling various merchandise at wholesale to the owners of Western Auto Associate Stores in North Carolina. In 1971, Western Auto and Vick reached an agreement for Vick to purchase the assets of a Western Auto Store in Rocky Mount, North Carolina, which had previously been operated by Western Auto for its own account. In connection with this agreement the parties executed three documents: (1) a "Western Auto Associate Store Contract", governing the terms of the franchise; (2) a "Purchase Agreement", regulating the assignment of conditional sales contracts by Vick to Western Auto and the respective liabilities of the parties with respect to such transactions; and (3) a security agreement granting Western Auto a security interest in much of Vick's presently owned and after acquired property, including conditional sales contracts entered into between Vick and his customers.

In connection with his acquisition of the store assets, Vick also purchased and became legally responsible for the collection of chattel paper generated from the operation of the company-owned store, then having a total outstanding unpaid balance of about $175,000. The parties had the understanding that the chattel paper would be treated as though generated by Vick in the operation of his store and assigned to Western Auto under the purchase agreement.

After Vick purchased the store from Western Auto, it became a Western Auto Associate Store, meaning that it was owned and operated by Vick independent of any control of Western Auto. At the time that Vick commenced operation of his store, he was furnished with a supply of retail installment sales agreement forms to be used by Vick in connection with the documentation of any sale of merchandise to his retail customers that involved a time payment arrangement. Vick was also given a supply of transmittal forms to be used by him in submitting his retail installment sales agreements (chattel paper) to Western Auto for credit on his account.

The Western Auto system of accounts involved several account categories under which charges made to Vick might be entered: (1) a "regular" account; (2) a "trade acceptance" account; (3) a "dating terms" account; and (4) a "floor plan" account. On 29 December 1972 a memorandum was issued by Western Auto to Vick which specified that as to charges made to Vick's regular account, payment would be due not later than the tenth day of the month for charges reflected in the statement of account issued by Western Auto around the first of the month and the payment would be due not later than the twenty-fifth day of the month on the statements of account issued by Western Auto at mid-month.

Vick satisfied the charges made to his regular account, and in some instances the charges made to his trade acceptance, floor plan and dating terms accounts, by either sending to Western Auto cash payments or by submitting to Western Auto chattel paper generated from his store operations. The chattel paper was attached to a letter of transmittal, which listed all of the agreements attached to it and specified certain information about the amounts due upon and finance charges applicable to each of such agreements. Letters of transmittal were so structured that Vick would compute the amount of credit that he was requesting under each such letter. This computation involved the deduction from the total amount due on each contract of either sixty-five percent or seventy percent (depending upon the terms of the particular agreement) of the finance charges specified in each agreement as the portion of such finance charges Western Auto was to retain for itself when the sums

due under the chattel paper were collected. One copy of the transmittal letters was returned to Vick with a notation on it by Western Auto as to the amount of credit that was being made to his accounts pursuant to the letter. The amount of the credit given by Western Auto as to each letter of transmittal was noted on the copy returned to Vick and corresponded to a credit shown on the next statement of account issued by Western Auto to Vick.

Statements of account were periodically furnished by Western Auto to Vick. In the early part of the relationship between the parties, these statements of account were issued as often as weekly, but after January 1977, they were issued semi-monthly. The statements of account detailed all the charges to each of Vick's accounts, *i.e.*, regular, trade acceptance, dating terms and floor plan, and showed the credit given on each of these accounts. As to all chattel paper assigned by Vick, Western Auto submitted to Vick each month an "installment billing" for the aggregate of all payments due during that month on the chattel paper, the aggregate amount due also being detailed on his statement of account under the heading "installment." If Vick failed to collect the total amount due under the chattel paper from Vick's customers, Vick was required to remit to Western Auto the difference. It was Vick's responsibility to see that all payments due under the chattel paper were collected, to send out any delinquency notices that were required, and to repossess any merchandise if monthly payments were not forthcoming as required under the agreement. Auditors of Western Auto periodically examined the ledger cards maintained by Vick as to each amount and if any customer was found to be in arrears more than ninety days, Vick was required to pay to Western Auto the entire balance due on the particular account, notwithstanding the fact that the monthly payments on such accounts made by Vick to Western Auto were on a current basis. Upon Vick's making such payoff, the chattel paper was returned to him. The billings for these payoffs were called special installment billings and were detailed on the statements of account submitted by Western Auto to Vick.

No transaction in which chattel paper was submitted to Western Auto involved an amount equal to or greater than

$50,000. In July 1975 Vick executed a deed of trust to Robert L. Spencer, trustee for Western Auto, to secure Vick's indebtedness to Western Auto of $72,056.00. During the time Vick was a Western Auto dealer, he was free to transfer his chattel paper to entities other than Western Auto. In connection with the transfer of chattel paper by Vick to Western Auto, Vick never received any money from Western Auto.

Western Auto filed this action against Vick, claiming he was in default of his obligations under the purchase agreement. Vick answered, denying that the agreement was in default. Vick further defended and counterclaimed, alleging that the practices of Western Auto with respect to the assignment of chattel paper were corruptly intended by Western Auto to collect interest from Vick at an unlawful and usurious rate. By consent of the parties, Vick's counterclaim for usury was ordered severed from the remainder of the action and tried without a jury. At the trial of this counterclaim the trial court denied Western Auto's motion for an involuntary dismissal under G.S. 1A-1, Rule 41(b), but nevertheless granted judgment for it on the counterclaim itself. The judgment was certified for immediate appellate review under Rule 54(b). From the judgment granted in favor of the plaintiff Western Auto, defendant Vick appeals. Plaintiff cross-appeals from the court's denial of its Rule 41(b) motion.

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by Michael E. Weddington and Carl N. Patterson, Jr., for the plaintiff appellee.*

*Biggs, Meadows, Batts, Etheridge & Winberry, by Samuel W. Johnson, for the defendant appellant.*

WELLS, Judge.

[1] Defendant first assigns as error two findings of fact made by the trial court on grounds that they were not supported by any evidence. The court's findings of fact are conclusive on appeal if supported by any competent evidence, even though there may be evidence in the record to support contrary findings. *Henderson County v. Osteen*, 297 N.C. 113, 254 S.E. 2d 160

(1979). However, if there is no evidence in the record to support findings to which proper exceptions have been entered, they must be set aside. *See, Insurance Co. v. Lambeth*, 250 N.C. 1, 108 S.E. 2d 36 (1959). The two challenged findings read as follows:

> 10. Without regard to whether payment for merchandise purchased by Vick from Western Auto and reflected on a "statement of account" rendered by Western Auto to Vick was made in cash or with chattel paper, the amounts for which Vick was given cash or chattel paper — equivalent credit upon his account(s) were no longer deemed by Western Auto or Vick to be owed by Vick to Western Auto for the merchandise purchases by Vick reflected in his account(s).

*  *  *

> 16. From the written agreements entered into between Western Auto and Vick and their course of dealing thereunder, which was not inconsistent therewith, it is clear that Western Auto and Vick intended and viewed the transactions between them as the purchase and sale of merchandise and the purchase and sale of chattel paper.

We find that there is no evidence in the record to support these findings. The purchase agreement entered into between the parties contained provisions requiring Vick to repurchase chattel paper upon the occurrence of certain events, to collect all the installments as they came due from the customers, and to remit all such installment payments to Western Auto whether or not they had been paid by the customers. The agreement also contains the following key provision: "The Company shall have all of the rights of the Dealer, and the Dealer shall remain liable to the Company for any deficiency on such Chattel Paper, including the Company's reasonable expenses and attorney fees." As to collection and remittance arrangements and practices, Vick testified:

> When I sent chattel paper to Western Auto, they kept the original and sent me back a copy. Collections were made on the payments due on the paper by people coming to the store and making payments or mailing the payments in or

in some cases we'd have to go to see them to pick up the payments. Western Auto was not involved in any way with the collection of payments from my customers. Western Auto did not send out any notices of delinquencies and it did not have any representatives call on my customers and attempt to collect payments. I maintained collection records by keeping a ledger card posted up to date for each customer and I kept a separate ledger card on each contract that was sent in to Western Auto. When I collected payments from customers I noted the collections on the ledger card and put the money into a special bank account and sent it to Western Auto. If a customer didn't pay me one month I had to make the payment for him to Western Auto. Western Auto sent me a statement each month showing all the customers and how much they owed, and that is the way we paid that. The auditors of Western Auto came around and checked my ledger cards every now and then. If they found a customer was behind over 90 days, I would have to pay the account off in full. All the auditor did was check the ledger card and call for a pay-off on certain ones if they were behind, and they checked the credit information if it was a new account.

As to the treatment of the chattel paper sent to Western Auto by Vick, Western Auto's auditor testified as follows:

Q. Now, Mr. Gallimore, I believe in response to questions put to you by Mr. Weddington that you have said that merchandise charged to Mr. Vick's Regular account can be paid by cash or by the chattel papers.

A. Yes, sir.

Q. And that when you got the chattel paper in that you credited his account with, his Regular account wiped it out, you said, that much of the charge.

A. Yes, sir.

Q. I believe that is what you said.

A. Right.

Q. And I believe you said that he didn't owe you that amount. Is that what you meant to say?

A. I said what?

Q. That as soon as he got that credited he didn't owe it anymore.

A. That is correct. This eliminated that charge, that portion of the charge on his Regular account.

Q. Now what you mean is he didn't owe it under that account.

A. That is correct.

Q. But he was still obligated to pay it, wasn't he, until that chattel paper was paid out?

A. He owed the amount of the paper, yes.

Q. So that was, as you said, just a paper transaction. You credited that, and debited him somewhere else.

A. That is correct.

The factual pattern that thus emerged from the record is that to the extent Vick paid for his purchases of merchandise from Western Auto with chattel paper, Vick continued to be obligated or indebted to Western Auto for the payments reflected in the chattel paper until *Vick* remitted cash to Western Auto equivalent to those installments. We believe the following chart of events and transactions expresses in shorthand fashion the undisputed evidence before the trial court.

*Substance of the Transactions*

I. Extension of Credit and Payment of Principal

A. Vick makes wholesale purchases from Western Auto on open credit accounts which may be collected as due on ten days notice.

B. Vick pays for the items due on account with cash or by assigning Western Auto what is in effect the installments due under the chattel paper.

C. Vick remains responsible for collecting and forwarding amounts due from individual installment debtors to Western Auto. Vick must pay to Western Auto all installments when due, whether or not the installments were paid by the individual debtors, and Vick must repurchase all chattel paper from Western Auto on accounts more than ninety days in arrears even though he has been making the payments as they became due to Western Auto.

D. Western Auto obtains a security interest in the chattel paper collateralizing Vick's debt.

II. Forbearance

A. For the period specified in each installment contract, Western Auto refrains from collecting from Vick sums due under the contract.

III. Interest

A. As Vick pays off the deferred installment payments under the chattel paper, he is credited only with that portion of the installments attributed to principal, plus thirty or thirty-five percent of the finance charge. Western Auto keeps for itself sixty-five or seventy percent of the finance charge.

We find no evidence in the record in support of the trial court's Findings of Fact Nos. 10 and 16, and defendant's exception to these findings must accordingly be sustained. *Accord, Morse v. Curtis*, 276 N.C. 371, 172 S.E. 2d 495 (1970).

**[2]** Vick maintains that the transactions between the parties with respect to the chattel paper fall within the purview of the usury laws. The elements of usury are: (1) a loan or forbearance of money; (2) an understanding that the money loaned shall be returned, or the credit extended shall be repaid after the forbearance; (3) payment or an agreement to pay a greater rate of interest than that allowed by law; and (4) a corrupt intent to take more than the legal rate for the use of the money. *See, Henderson v. Finance Co.,* 273 N.C. 253, 160 S.E. 2d 39 (1968). The trial court concluded that: the transactions complained of did not involve a loan or forbearance; if any amount was owed by Vick to Western Auto it was in excess of $300,000 and not subject to interest limitations under G.S. 24-1.1A(e); no interest payments were made by Vick; Vick was not required to make any interest payments out of his own funds; Western Auto did not intend to reserve for itself any interest in the transactions; and the time-price doctrine prevented the transactions from falling under the usury statutes. We hold that the complained-of transactions fall clearly within the purview of the usury laws.

Western Auto extended Vick credit for Vick's purchases of merchandise and had the authority to collect all amounts due on Vick's regular account on ten days notice. The term "forbearance" has been defined as

> a contractual obligation of a lender or creditor to refrain during a given period of time from requiring a borrower or debtor to pay a loan or debt that is due and payable. In case of a forbearance, it is not necessary that it be preceded by an actual loan, provided a debt has already been created; the usury will consist in the agreement for excessive interest in order to secure an extension of time.

45 Am. Jur. 2d, Interest and Usury § 117, p. 102 (1969). Western Auto accepted the chattel paper as security for its extension of credit and collected from Vick sixty-five or seventy percent of the unearned finance charge as the charge for its forbearance. Western Auto's retention of a portion of the unearned finance charge on each contract is analogous to a service charge taken by Western Auto for its forbearance from collecting on a portion

of a debt owed to it by Vick. We have previously held such a forbearance subject to the usury laws. *Supply, Inc. v. Allen,* 30 N.C. App. 272, 227 S.E. 2d 120 (1976).

The assignment of the chattel paper to Western Auto under the conditions in this case is clearly distinguishable from the pure sale of paper at a discount. Since Vick was required to pay all installments under each contract to Western Auto when they came due and to repurchase all chattel paper which became more than ninety days overdue, Vick, in effect, guaranteed payment of all the contracts.

> As to the character and effect of such a transaction the authorities present some four different views. Some courts have held such a transaction to be clearly usurious, and that the usurious indorsee takes no rights against any of the parties to the instrument. Others have held that while the transaction between the indorser and indorsee is usurious, the defense of usury is personal to the indorser and is not available to the prior parties. A third view, while holding the transfer not usurious, limits the right of recovery against the vendor-indorser to the amount received by him with lawful interest, and gives the purchaser recourse against prior parties to the full amount of the obligation. In still other jurisdictions such a transaction is regarded as a valid sale of a chattel with a warranty of its soundness, and the purchaser is allowed to enforce the obligation to its full extent against his own indorser and all prior indorsers.

91 C.J.S., Usury § 19 (a)(3), p. 595 (1955). At least as between indorser and indorsee, such transactions have been subject to the usury laws in North Carolina for over a hundred years. *See, Bynum v. Rogers,* 49 N.C. 399 (1857); Annot., *Usury as Predicated Upon Transaction In Form of a Sale or Exchange of Commercial Paper or Other Choses In Action,* 165 A.L.R. 626 (1946).

We agree with Vick that *Associated Stores, Inc. v. Industrial Loan & Invest. Co.,* 202 F. Supp. 251 (E.D.N.C. 1962), *aff'd per curiam,* 326 F. 2d 756 (4th Cir. 1964), *cert. denied,* 379 U.S. 830, 13 L.Ed. 2d 39, 85 S. Ct. 60 (1964), is in point. In the *Associated* case, Associated was in the business of selling home appliances and

occasionally needed to borrow money. The money was furnished by Industrial through its purchase from Associated of conditional sales contracts which Industrial bought at an eleven percent discount. However, Associated guaranteed payment of the contracts by indorsement. Judge Craven held that the fact that neither of the parties regarded the transactions as loans was not determinative under the usury laws of North Carolina:

> "It has been repeatedly held, in this State, that while one may buy a note from another, at any price that may be agreed upon, the bargain being free from fraud or unlawful imposition, if the purchaser requires the indorsement of the seller as a guaranty of payment, the transaction, as between the immediate parties thereto, is in effect a loan, and will be so considered, within the meaning and purport of our laws against usury." *Bynum v. Rogers*, 49 N.C. 399; *Ballinger v. Edwards*, 39 N.C. 449; *McElwee v. Collins*, 20 N.C. 350; *Sedbury v. Duffy*, 158 N.C. 362. [*sic*]

> "A profit, greater than the lawful rate of interest, intentionally exacted as a bonus for the loan of money, imposed upon the necessities of the borrower in a transaction where the treaty is for a loan and the money is to be returned at all events, is a violation of the usury laws, it matters not what form or disguise it may assume." *Doster v. English*, 152 N.C. 339, 67 S.E. 754; *Monk v. Goldstein*, 172 N.C. 516, 90 S.E. 519.

> It is a half-truth to call the transactions between Associated and Industrial "sales at a discount" ... .

> \* \* \*

> A rose is a rose is a rose, and smells the same by any other name. The parties contemplated and contracted that in all events Industrial was to get back all of its monies advanced plus approximately 11 per cent. This invokes the application of the Usury law of North Carolina — if other essential elements are present. The shorthand way of expressing this conclusion is to call it a loan transaction, which conclusion of law I adopt and confirm.

202 F. Supp. at 253. Associated received cash in return for the contracts, which gave the transactions examined in that case the appearance of being loans, rather than forbearances. In the present action, for each contract assigned, Vick received Western Auto's agreement to forbear from collecting a certain sum until the installments came due. The North Carolina usury statutes cover forbearances from the collection of debts as well as loans. *See*, G.S. 24-1.1 *et seq; Ausband v. Trust Co.*, 17 N.C. App. 325, 194 S.E. 2d 160, *cert. denied*, 283 N.C. 257, 195 S.E. 2d 689 (1973). We detect the same scent of roses in this case that Judge Craven found in *Associated*. To summarize, the undisputed evidence of Vick's continuing obligation with respect to the payment of the installments due under the chattel paper as well as Vick's guarantee of those payments and the fact that Vick had the sole responsibility for collecting the installments due under these installment contracts, clearly differentiate these transactions from the *bona fide* sale and purchase of chattel paper.

While the law may be contrary in other jurisdictions, it is clear that in North Carolina such transactions fall within the protection of the usury statutes. *Compare, Lake Hiwassee Development Co., Inc. v. Pioneer Bank*, 535 S.W. 2d 323 (Tenn. 1976); *A.B. Lewis Co. v. National Investment Corp. of Houston*, 421 S.W. 2d 723 (Tex. Civ. App. 1967). The vitality of the usury statutes would not be maintained by allowing creditors to charge unlawful interest rates merely by disguising the form of their transactions. We must be concerned with substance and not form, *Bank v. Merrimon*, 260 N.C. 335, 132 S.E. 2d 692 (1963), and we consider the "assignment" of the chattel paper and retention of a portion of the unearned finance charge as they were viewed by Western Auto — as security and payment for Western Auto's forbearance from collecting on Vick's debt.

[3] The third element of usury is the charging of interest at an unlawful rate. Western Auto argues that since the total balance which Vick owed was considered to be in excess of $300,000, the parties were free to agree on any rate of interest under G.S. 24-1.1A(e), as that statute was in effect at that time. We hold that the only reasonable interpretation of this statute is that the principal amount financed must be determined on a transac-

tion-by-transaction basis, at least where the transactions are not contemporaneous, and not on the basis of the aggregate amount owing between the parties. Since the parties have stipulated that the precise amount of interest paid by Vick which was subject to the usury statutes is to be determined at a later time, we do not reach the issue as to which section of Chapter 24 is applicable to each of the transactions presented in this case.

[4] We also hold that Vick has shown the requisite corrupt intent on the part of Western Auto for the suspect transactions to be held usurious. "The corrupt intent required to constitute usury is simply the intentional charging of more for money lent than the law allows." *Kessing v. Mortgage Corp.*, 278 N.C. 523, 530, 180 S.E. 2d 823, 827 (1971). The evidence contained in the record leads to the unmistakable conclusion that Western Auto intended to exact the interest which it did by keeping sixty-five or seventy percent of the unearned finance charge on each of the contracts "assigned." Nothing more need be proven under our Supreme Court's analysis in *Kessing* than Western Auto's deliberate exaction of the charges made.

[5] Finally, Western Auto argues that the transactions complained of fall within the "time-price" exception to the usury statutes. As Judge (now Justice) Brock stated in *Supply, Inc. v. Allen*, 30 N.C. App. 272, 279-280, 227 S.E. 2d 120, 125 (1976), in holding the time-price doctrine inapplicable to the otherwise usurious forbearance presented in that case:

> Usury only pertains to a loan or forbearance of money, not a *bona fide* sale. In recent years the definition of bona fide sale has been expanded to include credit sales in which the difference between the cash price and the credit or time price is greater than the allowable rate of interest.
>
> "A vendor may fix on his property one price for cash and another for credit, and the mere fact that the credit price exceeds the cash price by a greater percentage than is permitted by the usury laws is a matter of concern to the parties and not to the courts, barring evidence of bad faith. (Citations omitted.)

. . . .

"If there is a real and bona fide purchase, not made as the occasion or pretext for a loan, the transaction will not be usurious even though the sale be for an exorbitant price, and a note is taken, at legal rates, for the unpaid purchase money. The reason is that the statute against usury is striking at, and forbidding, the extraction or reception of more than a specified legal rate for the hire of money, and not for anything else; and a purchaser is not, like the needy borrower, a victim of a rapacious lender, since he can refrain from the purchase if he does not choose to pay the price asked by the seller." *Bank v. Merrimon*, 260 N.C. 335, 132 S.E. 2d 692 (1963). Thus it appears that the sale of merchandise is not usurious when the sale is made for one price if cash is paid and for a higher price if payment is deferred or made in future installments, so long as the transaction is not a subterfuge to conceal a usurious loan.

*See also, Bank v. Hanner*, 268 N.C. 668, 151 S.E. 2d 579 (1966); *Bank v. Merrimon, supra.*

We hold that from the substance of the transactions presented in this case the time-price doctrine is inapplicable. As we stated previously, the transactions complained of here did not involve the *bona fide* sale of chattel paper. Vick's obligation to Western Auto was not finally determined when the contracts were assigned to Western Auto, but only when installments were paid under these contracts. The contracts themselves were merely regarded by the parties as security for the advancement of credit by Western Auto to Vick.

Furthermore, the suspect transactions possessed none of the attributes commonly associated with time-price sales. Fundamentally, the time-price doctrine requires that the cash price *and* time-price be fixed and quoted to the buyer at the time of the sale in order to afford the buyer a genuine choice. *Supply, Inc. v. Allen, supra.* In the present action, Vick was never quoted a *fixed* time-price since, even after the assignment, Vick

remained liable to Western Auto for each installment debtor's default on the underlying contract. Vick alone assumed the risk of the individual debtor's default.

In *Ripple v. Mortgage Corp.*, 193 N.C. 422, 424, 137 S.E. 156, 157-158 (1927), our Supreme Court enunciated the general standard by which the courts of our State must examine allegedly usurious transactions:

> Our courts do not hesitate to look beneath the forms of transactions alleged to be usurious in order to determine whether or not such transactions are in truth and in reality usurious ... . Where a transaction is in reality a loan of money, whatever may be its form, and the lender charges for the use of his money a sum in excess of interest at the legal rate, by whatever name the charge may be called, the transaction will be held to be usurious. The law considers the substance and not the mere form or outward appearance of the transaction in order to determine what it in reality is. If this were not so, the usury laws of the State would easily be evaded by lenders of money who would exact from borrowers with impunity compensation for money loaned in excess of interest at the legal rate.

From the testimony, instruments, and stipulated practices of the parties, we find that the only reasonable conclusions which may be drawn in the case *sub judice* are that the complained-of transactions involve the payment of interest in return for a forbearance in the collection of money owed on account, and that these transactions invoke the protection of our State's usury statutes. Our opinion makes it unnecessary to reach plaintiff's cross-assignment of error. We reverse the judgment of the Superior Court on defendant's appeal, affirm the court's judgment with respect to plaintiff's appeal, and remand the case with instructions that the court make findings and enter judgment consistent with this opinion.

Reversed in part and affirmed in part.

Judges WEBB and MARTIN (Harry C.) concur.